THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONNIE T. LITTLE, Defendant-Appellant.

Second District   No. 2—90—0505

Opinion filed December 30, 1991.

G. Joseph Weller and Beth Katz, both of State Appellate Defender's Office, of Elgin, and John R. Wimmer, of Downers Grove, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Ronnie T. Little, was charged by indictment with the offense of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)). After a jury trial, judgment was entered on the verdict on March 27, 1990. Defendant was sentenced to 15 years' imprisonment on April 19, 1990. His post-trial motion and his motion to reconsider the sentence were denied on April 26, 1990, and this timely appeal followed. We affirm.

On appeal, defendant contends that he was denied the effective assistance of counsel because defense counsel improperly impeached his own alibi witness by eliciting that the witness had pleaded guilty to a drug offense and because defense counsel failed to object to improper argument by the State where it sought to create an inference of guilt by commenting on defendant's post-arrest silence. Defendant also argues, alternatively, that this court should consider as plain error the allegedly improper argument of the State. For the reasons that follow, we find no basis to reverse the judgment.

The jury trial was held on March 26 and 27, 1990. On the first day of trial, defense counsel informed the court and the prosecutor that Deborah Hurley, one of defendant's alibi witnesses, had pleaded guilty to a drug offense and was awaiting sentencing. Defense counsel noted, "I did not think that was a prior conviction, and therefore could be used for impeachment." The prosecutor, wanting to avoid

even the possibility of a reversal, argued initially that the guilty plea was admissible for purposes of impeachment; however, he also proposed that, if the court had any question in that regard, the prosecutor would move for a continuance until the witness' case was "finalized." The court made no ruling regarding a continuance. Defense counsel responded by stating, "I am not making a motion in limine [*sic*]. I do not anticipate making an objection if that question comes up with regard to whether she has pled guilty to a felony offense."

At trial, 19-year-old Debbie Ann Shelley testified for the State. At the time of the robbery, she was employed as a cashier at Jim's Amoco in Zion, Illinois. She worked in the minimart five days a week. On January 30, 1990, she was working the 3 p.m. to 11:15 p.m. shift. The cash register was located in the center of the store, and there was one door 6 to 10 feet away for entering and exiting the store.

At approximately 10:40 p.m., Shelley was waiting on a customer when she heard the door open and saw a man whom she identified in court as defendant walk in. He walked up to the right side of her counter and pointed a gun at the register. She testified that she looked at him and she froze, still looking at him. He walked around to the front of the register, and, when he was located one or two feet away, he hit it with his left hand saying, "Open the register." When Shelley still "froze," he stated, "I said, open the mother f---ing register." Shelley did a "no sale" and the drawer opened. Defendant could not reach the cash drawer, so Shelley took it out and set it on the counter. Defendant picked up the drawer containing about $280 and left.

Shelley stated that defendant was wearing a stocking over his face, a knit cap and a long, black trench coat and tennis shoes. His hands were covered with socks. She knew defendant through his brother Frank; she had known him for about four or five years and had had conversations with him more than 10 times. She recognized his voice. When he hit the register, defendant "clicked" in her mind. Dollie Wilson hit the alarm button, and the Zion police arrived shortly thereafter.

About 20 minutes after the robbery occurred, Officer Watkins arrived. He took Shelley aside and stated that she was not to discuss with anyone what she was looking at; he showed Shelley six photographs of young black males. She picked out a photograph of defendant as the person who had committed the robbery. She again identified that photograph in open court. Shelley identified scenes of the robbery from a surveillance videotape. (We note that the monochromatic tape and enlarged photographs of frames from the tape do not

have high resolution so that they only portray the figures generally. The videotape shows that the robber was wearing a light-colored hat.)

On cross-examination, Shelley acknowledged that she was scared at the time of the incident and saw the robber for less than a minute. She had described to Watkins a person who was a black male, about 5 feet 5 inches tall with a muscular build. She had told Watkins that the robber wore a hat that was possibly dark in color and he had a stocking stretched tight over his face. She denied that she told Watkins that the robber was wearing a waist-length jacket. She told Officer Watkins that she made eye contact with the robber and that he had dark eyes, but she could not tell whether they were black or brown. She also told Officer Brooks, who was first on the scene before Watkins arrived, that she thought that defendant was the robber. On redirect examination, Shelley stated that she recognized defendant as soon as he walked into the store.

Dollie Wilson testified that she was also employed at Jim's Amoco at the time of the robbery. When the robber, a black man, walked into the store, she was located right behind and to the left of Shelley. He was wearing a "black stocking, black coat, hat, and was carrying what seemed to be a gun." She was about five or six feet away when she also heard him say, "Open the mother f---ing register." When Officer Watkins arrived, she identified a picture of defendant as the one who committed the robbery. She did not know defendant, but told the officer that she was "70 to 80 percent sure" that the photograph was that of the robber. When asked why she said that, she explained that she did not see his full face through the stocking; she could see his eyes, and she was going on the build of his body, his neck and what she could see through the stocking. After identifying defendant in open court, Wilson stated that she was still "70 to 80 percent sure."

On cross-examination, Wilson acknowledged that she was shocked and a little scared when the robber came into the store. She had told Watkins that the robber was about 5 feet 5 or 6 inches tall and that he was wearing a dark-colored baseball cap. The stocking slightly distorted his face.

Officer Clyde Watkins testified that he presented a group of six pictures to Shelley and Wilson. He included a picture of defendant because Officer Brooks had indicated that, during his preliminary investigation, defendant's name came up as a possible suspect. Watkins separated the witnesses and requested that they not discuss the case among themselves. Without hesitation, Shelley picked out the photograph of defendant. On cross-examination, Watkins acknowledged that

his report indicated that Shelley said the robber wore a black, waist-length jacket with a large collar.

Bernina Mata, an employee at Jim's Amoco, was called as a defense witness. During the robbery, she was standing behind Dollie Wilson about 8 to 10 feet from the robber. He was wearing a black stocking or hat, a long trench coat and a baseball cap. She could not see his face or tell whether he was white or black, but, because she heard him talk, she believed he sounded like a black man. She was unable to identify the robber from the same group of photographs shown to Shelley and Wilson. She could not identify the robber because she was not in a position to see his face.

W.C. Matthews testified that he was at the minimart at the time of the robbery. While he was at the counter paying for some merchandise, he noticed a strange look on the cashier's face. He looked back and saw a person standing two feet behind him with a gun pointed at him who said, "Get back." The robber had "a mask, black scarf of some kind around his face," and Matthews could not see his face. The robber wore a hat, a long trench coat and gloves. Matthews assumed that he had a gun, but it was covered up. He could not tell if the robber was white or black nor could he describe any facial features. He believed that the robber was 5 feet 3 inches tall.

Frank Little, defendant's 21-year-old brother, testified that, on January 30, 1990, the date in question, he lived at 2419 Hebron with Deborah Hurley, Bonita Bowers, and defendant. It was Hurley's apartment. Defendant came home about 9 or 9:15 p.m. while Frank was watching television downstairs with Hurley and Bowers. After defendant came in, he answered a telephone call which resulted in a brief argument between defendant and Hurley. Defendant went upstairs to take a shower. Frank left the house for 10 or 15 minutes. When he got back, defendant was still there. Sometime between 11 and 11:30 p.m., defendant went upstairs with Hurley and went to bed.

On cross-examination, Frank testified that he had been living at 4209 Birch for about five years. He lived at 2419 Hebron for about three or four months prior to January 30. He moved in with defendant and Hurley, defendant's girlfriend. He said that defendant had been living there since May or June 1989. Frank said that when he moved in Hurley's children were not living there and never did live there. On further questioning, Frank did not remember if Hurley's children lived there. When Frank stepped out of the house on the night in question, he left at about 9:30 to empty the garbage and to go to his girlfriend's sister's house four or five buildings down the street, and he returned about 15 minutes later. To his knowledge, no

one else came over to Hurley's apartment that night, unless it was when he was in the washroom.

Deborah Hurley testified for the defense. She stated that she had pleaded guilty to a drug-related offense and had not yet been sentenced. When defense counsel began to question her regarding the identity of the prosecutor in her case, the State objected, and a sidebar discussion followed outside the hearing of the jury. Defense counsel explained that he was anticipating impeachment based on a prior conviction and that he believed the questioning of his witness was relevant to whether she expected anything for her testimony and whether the prosecutor was from the same office as the prosecutor in the present matter. The court pointed out that the witness was called by the defense. The State expressed disdain at defense counsel's attempt to show an expectation of leniency. The objection was sustained.

When the examination of the witness resumed, Hurley testified that, on the date in question, she resided at 2419 Hebron in Zion. She had lived there for 3½ years. Defendant lived there, and Frank Little and Bonita Bowers stayed there. Defendant came home between 9:15 and 9:30 p.m. Frank and Bonita were present. Hurley received a telephone call from Rudolph Smith. When defendant got out of the shower, he asked who was on the telephone. When Hurley told him, this provoked a little argument; defendant preferred that she not speak to Rudolph. Defendant never left the house after he came home. He and Hurley went up to bed between 11 and 11:30 p.m. When defendant came home that night, he was wearing some navy blue or black dress pants and a jogging jacket with red on the shoulders. Hurley stated that defendant did not own any long coats.

On cross-examination, Hurley stated, without objection, that she had pleaded guilty to possession of a controlled substance with intent to deliver. She said that she was living on a regular basis with her children in October 1989. Defendant was not then living with her, but came to live with her about the end of November. On January 30, she was watching television with Bonita and Frank. While defendant was taking a shower, Bonita answered the telephone and asked Hurley if she would accept a collect call from Rudolph Smith. Hurley did not know where Frank was at that time. She also stated that someone named Blue came by that night after 11 p.m.

Defendant testified that he was 18 years old. On January 30, he was staying with Deborah, Frank, and Bonita at 2419 Hebron. That night, he arrived home at 9 or 9:15 p.m. He was returning from the house of a friend named Pepper Gibson. Once home, defendant talked

with Hurley, Frank and Bonita. Then he went upstairs and took a shower. When he came downstairs, Hurley had received a telephone call from Rudolph Smith, and defendant asked why Smith was still calling the house. Defendant did not leave the apartment that night. He stated that the minimart was about one mile away. He had known Shelley for about four or five years and had seen her at the minimart. He had also seen Dollie Wilson there. Defendant denied that he owned a trench coat; he did own a blue Bears hat with orange lettering on it.

On cross-examination, defendant stated that he had been living at 2419 Hebron for about four or five months. He denied that he told Keith Cooprider, an employee of pretrial services who prepared his bond report, that he had been living at that address for one month; defendant admitted that the report stated one month. Defendant said that, on January 30, he went to Gibson's house at about 8:40 p.m. before arriving home.

Defendant said that when he spoke to Officer Watkins, he was given his *Miranda* rights. The following courtroom colloquy took place between the prosecutor and defendant regarding his discussion with Watkins:

"Q. You never told Detective Watkins that you were with your brother, did you?

A. He didn't ask. He didn't ask about my witnesses.

Q. He told you you were being arrested for the armed robbery of the Amoco Station?

A. Yes.

Q. Three days afterwards?

A. Yes, he did.

\* \* \*

Q. Didn't you tell Detective Watkins who could tell them where you really were?

A. I told them Frank Little, Bonita Bowers, and Deborah Hurley.

Q. You told Detective Watkins you were with those people?

A. Yes, I did.

Q. That's what you are saying now?

A. Yes, I did."

In rebuttal, the State called Cooprider, a probation officer, who stated that defendant said he had been living at 2419 Hebron for one month. Cooprider made the report at the time defendant spoke to him.

Officer Watkins also testified in rebuttal that he interviewed defendant on February 3, 1990, at the police department after advising him of his *Miranda* rights. According to Watkins, defendant said he had been at the Gibson residence on January 30 and left there at approximately 9 p.m. to go home at 2419 Hebron. Defendant was not sure what time he arrived home, and he did not indicate that he was with Frank, Bonita or Hurley on the evening of the 30th.

On cross-examination, Watkins said he did not go to the Gibson home to verify whether defendant was there on January 30, nor did he go to 2419 Hebron to investigate.

Officer Ray Nichols went to the Gibson residence to attempt to determine whether defendant had been there on January 30, but none of the occupants could verify whether defendant had been there on that date.

During the rebuttal portion of the State's closing argument, the prosecutor stated in pertinent part:

"Then if you, in fact, were confronted by a police officer and told Saturday night you robbed Jim's Amoco, where where [*sic*] you if you didn't do it? *** Realizing that your liberty is at stake, you are unjustly accused, are you not going to tell the police who you were with? Go talk to my brother. Go talk to my girlfriend. Go talk to my brother's girlfriend. They will tell you I was with them. ***

Why doesn't he tell them who he claims today to have been with? Because on February 3rd when he talked to the police officers he didn't know who he could get to bolster his alibi."

Defense counsel did not object to this argument. Following deliberations, the jury returned a verdict of guilty.

Defendant's claim of improper impeachment and improper argument by the State were not preserved by objection at trial or by way of his post-trial motion. Defendant therefore argues that he was denied the effective assistance of counsel because his attorney impeached his own alibi witness, Deborah Hurley, by eliciting testimony that she had recently pleaded guilty to a drug-related offense. Additionally, defendant complains that his counsel's failure to object to the State's closing argument regarding defendant's post-arrest silence as to his alibi witnesses seriously prejudiced his case.

In order to prevail on a claim of ineffective assistance of counsel, defendant must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) that he was substantially prejudiced, that is, counsel's deficient performance created a reasonable probability that, but for defense counsel's

deficient performance, the result would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. See *People v. Rogers* (1988), 172 Ill. App. 3d 471, 478, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *People v. Pecoraro* (1991), 144 Ill. 2d 1, 13.

Without conceding that defense counsel's allowance of testimony regarding Hurley's guilty plea was error and without citation to specific pertinent authority, the State argues that this impeaching testimony, standing alone, was insufficient to have an effect on the jury's verdict because of the strength of Shelley's identification of defendant as the robber. Also without citation to specific authority on the subject of prosecutorial remarks pertaining to a defendant's post-arrest silence, the State argues, in a conclusory manner, that the failure to object to portions of the closing argument was merely overall strategy and does not establish incompetent representation and that, because of the strength of the evidence against defendant, the allegedly improper prosecutorial comment was not a material factor in defendant's conviction (citing *People v. Pecoraro* (1991), 144 Ill. 2d 1, for this latter general proposition). The State paints with such a broad brush that its analysis is not very helpful to this court. In order to achieve a just result, we will examine in detail each of the issues and subissues raised by defendant, notwithstanding the State's failure to do so.

■ The first issue is whether it was error for defense counsel to impeach his own witness by eliciting her testimony that she had just pleaded guilty to a charge of possession of a controlled substance with intent to deliver. It is clear that Hurley had not yet been sentenced. The State objected to defense counsel's attempt to discredit his own witness by suggesting that she might have an expectation of leniency from the State. The court correctly pointed out that this was defendant's witness, not the State's, and sustained the State's objection to this line of questioning. We find inexplicable defense counsel's anticipatory impeachment of his own witness under these circumstances, and we fail to see what advantage this approach could have secured for defendant.

The credibility of a witness may be impeached by evidence of a prior conviction (see *People v. Montgomery* (1971), 47 Ill. 2d 510, 516), and a conviction becomes final only when defendant has been sentenced (*People v. Lashmett* (1984), 126 Ill. App. 3d 340, 346). Proof of arrests, indictments, charges, or the actual commission of a crime is not generally admissible to impeach a witness on the basis of a prior conviction. (See *People v. Mason* (1963), 28 Ill. 2d 396, 400.) Here

there was only testimony that the witness had pleaded guilty to a drug-related offense; since there was no showing of a final judgment on a conviction, it was error to permit the impeachment of the witness on this basis. (See *People v. Johnson* (1987), 154 Ill. App. 3d 301, 307; *People v. Charleston* (1985), 132 Ill. App. 3d 769, 775; *People v. Maas* (1910), 154 Ill. App. 11, 12.) Moreover, there are no facts in the record to show that the witness had any expectation of leniency. Where the examination of the witness concerning the pending matter would not have tended to show her bias or interest in the case at bar, impeachment on this basis was improper. See *Lashmett*, 126 Ill. App. 3d at 346.

Having determined that defense counsel's attempt to impeach his own alibi witness was improper, we nevertheless conclude that, under the circumstances present in this case, the error does not meet the second prong of the *Strickland* test for substantial prejudice warranting reversal. We do not believe that the evidence was so closely balanced or the error of such a magnitude that defendant was deprived of a fair trial. (See *Pecoraro*, 144 Ill. 2d at 17.) Shelley, the State's principal eyewitness, was unequivocal in her identification of defendant. She recognized him as soon as he entered the store, and she recognized his voice, having known him for several years. She described him to the police and picked him out of a photographic array without hesitation. Her identification and her testimony were substantially corroborated by another eyewitness employee, Dollie Wilson, who had not known defendant prior to the robbery. While there was an attempt to impeach Shelley's testimony regarding minor discrepancies concerning the color of the robber's hat or the length of his coat, her testimony was competent. The fact that she had some prior acquaintance with the accused strengthened the reliability of her identification testimony. See *People v. Watkins* (1976), 44 Ill. App. 3d 73, 77.

Defendant had an opportunity to present the testimony of six witnesses in addition to his own testimony. His eyewitnesses were unable to identify the robber, but they appeared not to have been in a position to do so. The fact that other witnesses were unable to identify the perpetrator does not require reversal. (*Watkins*, 44 Ill. App. 3d at 77.) In addition to his own alibi testimony, defendant presented the testimony of two alibi witnesses, and the State was able to point out some internal inconsistencies in Frank Little's testimony as well as inconsistencies between Hurley's and Frank Little's testimony, particularly with respect to the duration and timing of defendant's and Frank's stay at the apartment. This case necessarily turned on the credibility of the witnesses. In viewing the totality of the evidence, we

cannot say that the impeachment of Hurley on an unrelated matter was a material factor in defendant's conviction such that it undermines our confidence in the outcome.

■ Defendant argues that prejudicial error was committed when his counsel failed to object when the State elicited and commented on defendant's post-arrest silence regarding his exculpatory alibi story. In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Court determined that a defendant was denied due process when a State prosecutor sought to impeach the defendant's exculpatory story, told for the first time at trial, by cross-examining him about his failure to give the statement at the time of his arrest after receiving *Miranda* warnings.

The *Doyle* Court itself specified one exception in which prosecutorial comment on post-arrest silence was warranted:

> "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the *same* version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild*, 505 F.2d 1378, 1383 (CA5 1975)." (Emphasis added.) (*Doyle*, 426 U.S. at 619 n.11, 49 L. Ed. 2d at 98 n.11, 96 S. Ct. at 2245 n.11.)

(See also *People v. Beller* (1979), 74 Ill. 2d 514, 522.) Thus, the State may comment on post-arrest silence if the defendant at trial falsely claims that he also gave his exculpatory statement to the police when arrested, and he may be impeached with evidence that he did not do so. (*People v. Adams* (1981), 102 Ill. App. 3d 1129, 1132, citing *People v. Rehbein* (1978), 74 Ill. 2d 435, 441-42.) The second exception to the *Doyle* rule recognized in Illinois is that, if a defendant's exculpatory testimony at trial is manifestly inconsistent with statements he made after his arrest, comment or evidence about his failure to give the same statement at that time will not violate the *Doyle* rule. *Adams*, 102 Ill. App. 3d at 1132, citing *People v. Beller* (1979), 74 Ill. 2d 514, 522-23.

We believe that where, as here, a defendant chooses to speak to the police after he has been arrested and admonished of his rights, the *Doyle* rule does not apply to cross-examination showing the incompleteness or inconsistencies in his prior exculpatory statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not

been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. (See *People v. Foster* (1990), 199 Ill. App. 3d 372, 381-82 (explaining *People v. Chriswell* (1985), 133 Ill. App. 3d 458); see also *People v. Wilson* (1984), 123 Ill. App. 3d 798, 804 (where defendant had some discussions with police after his arrest he could be properly cross-examined regarding his failure to tell the police of his alibi).) *Doyle* simply bars comment and cross-examination as to silence claimed as a result of *Miranda* warnings, but does not bar comment on statements given after such warnings. *People v. Henson* (1978), 58 Ill. App. 3d 42, 46.

In the case at bar, defendant was not silent after he was given his *Miranda* warnings. Although he first stated that Watkins did not ask him about his alibi witnesses, defendant then testified that he told Officer Watkins where he was and that he was with Frank, Deborah, and Bonita. In rebuttal testimony, Officer Watkins contradicted this version of defendant's post-arrest behavior. Under the circumstances, the prosecution could properly comment upon the failure of the defendant to give the same version at trial of the exculpatory statement he gave after his arrest. Where a defendant falsely claims that he also gave his exculpatory statement to the police when he was arrested, he may be impeached with evidence that he did not do so. (*Adams*, 102 Ill. App. 3d at 1132.) Even if defendant argues that the prosecution should not have commented upon his possible silence by omission, we nevertheless deem any omission subject to impeachment as an inconsistent statement. See *People v. Hinson* (1979), 70 Ill. App. 3d 880, 886 (partial alibi given upon arrest and exculpatory statement given at trial resulted in a manifest inconsistency which prosecution could call to the attention of the jury and was not violation of *Doyle* rule).

We conclude that the State's cross-examination of defendant regarding prior omissions in his alibi as well its comments in its closing argument did not violate the *Doyle* rule as construed by Illinois decisions. We therefore do not consider defendant's last claim that the prosecution's conduct amounted to plain error, since there is no error to consider.

The judgment of the circuit court is affirmed.

Affirmed.

DUNN and BOWMAN, JJ., concur.