THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE L. SANCHEZ, Defendant-Appellant.

Third District   Nos. 3—07—0777, 3—07—0778 cons.

Opinion filed July 22, 2009.—Rehearing denied August 21, 2009.

Bryon Kohut, of State Appellate Defender's Office, of Ottawa, for appellant.

James Glasgow, State's Attorney, of Joliet (Terry A. Mertel and Dawn D. Duffy, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court:

The defendant, Jose L. Sanchez, was convicted of aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(2) (West 2004)) in case No. 05—CF—1512. The defendant was also convicted of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 2006)) and

unlawful possession of a firearm (720 ILCS 5/24—3.1(a)(2) (West 2006)) in case No. 06—CF—829. The trial court sentenced the defendant to 19 years in prison for aggravated battery with a firearm in case No. 05—CF—1512. That sentence was to run consecutive to the concurrent sentences of 3 and 11 years in prison for unlawful possession of a firearm and aggravated discharge of a firearm, respectively, in case No. 06—CF—829. The defendant appeals, arguing that: (1) his trial counsel was ineffective because his counsel failed to protect and preserve his statutory right to a speedy trial in case No. 05—CF—1512; (2) he was denied a fair trial for aggravated battery with a firearm in case No. 05—CF—1512 because the State elicited testimony from a police officer that the defendant did not mention an alibi, thereby improperly introducing evidence of the defendant's postarrest silence, and the State repeated the improper evidence during rebuttal closing argument; (3) he was denied a fair trial for aggravated battery with a firearm in case No. 05—CF—1512 when the State committed prosecutorial misconduct by stating in rebuttal closing argument that: (a) it would not have introduced the victim's photographic lineup identification of the defendant if the lineup had been suggestive; and (b) it would have presented the testimony of other witnesses to the shooting had there been any other witnesses; (4) the trial court erred in ordering him to pay a $4,212 public defender reimbursement fee without notice and a hearing; and (5) he is entitled to a credit of $5 per day for time served in presentence custody. We affirm in part, reverse in part, and remand for further proceedings.

## FACTS

On July 24, 2005, the defendant was arrested, and on July 25, 2005, he was charged by complaint, which was later supplanted by an indictment, with aggravated battery with a firearm (720 ILCS 5/12—4.2(a) (West 2004)) in case No. 05—CF—1512. On July 25, 2005, he made a written demand for a speedy trial. On December 17, 2005, the defendant posted bond and was released.

On April 9, 2006, the defendant was arrested, and on April 11, 2006, he was charged with aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 2006)) and unlawful possession of a firearm (720 ILCS 5/24—3.1(a)(2) (West 2006)) in case No. 06—CF—829. On April 11, 2006, the defendant made a written demand for a speedy trial but did not post bond in case No. 06—CF—829. On May 26, 2006, the State elected to proceed first on case No. 05—CF—1512.

On August 10, 2006, the State filed an amended indictment in case No. 05—CF—1512, charging the defendant with aggravated battery with a firearm (720 ILCS 5/12—4.2(a) (West 2004)), possession of

a firearm without a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2004)), possession of firearm ammunition without a FOID Card (430 ILCS 65/2(a)(2) (West 2004)), and two counts of unlawful possession of a firearm (720 ILCS 5/24—3.1(a)(1), (a)(2) (West 2004)). On August 14, 2006, the defendant filed a motion to sever the charge of aggravated battery with a firearm from the other offenses in the indictment because the firearm used in the aggravated battery with a firearm offense was not the same firearm that was alleged in the other offenses. On August 29, 2006, the trial court granted the defendant's motion to sever.

On September 5, 2006, the State elected to proceed to trial on the four charges related to possession of a firearm in case No. 05—CF—1512. The trial began on October 3, 2006, and on October 5, 2006, a jury acquitted the defendant of the charges. After the acquittal, the following colloquy occurred:

"THE COURT: We are outside the presence of the jury.

The defendant having been found not guilty in this particular case, any other matters—there is another case left, correct?

[STATE'S ATTORNEY]: Two.

THE COURT: Two cases.

[STATE'S ATTORNEY]: Count I of the '05 case is left and the '06 case is left.

THE COURT: What is happening on those cases? Are they set to follow this now?

[DEFENSE COUNSEL]: Not for trial.

[STATE'S ATTORNEY]: Just following for status.

THE COURT: Are you requesting a status date on the single count in 05 CF 1512 which remains and 06 CF 829?

[DEFENSE COUNSEL]: Can I have a status date on both?

THE COURT: Doesn't bother me.

[DEFENSE COUNSEL]: Can we do a week, October 13th?

THE COURT: October 13th, status on the other pending two matters."

At the October 13, 2006, status hearing, the State requested that case No. 06—CF—829 be set for trial on December 4, 2006. The defendant confirmed that the date was acceptable, and the trial court set the case for trial on that date. The parties and the trial court also discussed how many days remained on the statutory speedy trial term. The trial court thought that a new period of 160 days began after the acquittal but suggested that the parties research the issue.

On December 4, 2006, the State announced that it was ready for trial but noted that it failed to give the defendant certain discovery. The defendant stated that he would not be ready until he had seen the discovery. The trial court set the matter for the next day on the

defendant's motion. On December 5, 2006, the defendant moved for a continuance, and the trial court continued the case until January 9, 2007.

On January 9, 2007, the defendant filed a motion to suppress statements in case No. 06—CF—829. On January 10, 2007, the trial court denied the motion and proceeded to trial on case No. 06—CF—829. On January 12, 2007, a jury found the defendant guilty of aggravated discharge of a firearm and unlawful possession of a firearm. The trial court scheduled sentencing for March 13, 2007, on case No. 06—CF—829 and stated that it would set a trial date for case No. 05—CF—1512 on that date.

On March 13, 2007, the trial court was unavailable, and sentencing was reset for the next day. On March 14, 2007, the State requested a continuance of sentencing so that it could proceed to trial on case No. 05—CF—1512 and then have sentencing on all the charges. The defendant stated that he intended to set case No. 05—CF—1512 for trial and that he did not object to continuing the sentencing in case No. 06—CF—829. The trial court set case No. 05—CF—1512 for trial on April 18, 2007, and continued the sentencing in case No. 06—CF—829.

The defendant, either on his own motion or by agreement, subsequently continued case No. 05—CF—1512 on several occasions until June 20, 2007. On June 20, 2007, the defendant objected on speedy trial grounds to the State's motion to continue the case until June 25, 2007, but the trial court granted the motion. On June 22, 2007, the trial court struck the trial date of June 25, 2007, and set it for June 28, 2007. On June 28, 2007, the parties, by agreement, continued the case for trial on July 9, 2007.

The defendant's jury trial for the offense of aggravated battery with a firearm in the case No. 05—CF—1512 began on July 9, 2007. The following evidence, relevant to this appeal, was presented.

Jose Campos testified that at about 6 p.m. on July 23, 2005, he was riding his bicycle on Hickory Street in Joliet, Illinois. He was about three blocks from his house and was coming from a convenience store. He stated that near the intersection of Hickory Street and Granite Street, he saw a gold car traveling in the same direction as he. Campos testified that the defendant was in the front passenger seat and that two other people were in the car. The car went ahead of him and circled the block so that the next time he saw the car it was driving east on Granite Street, which was the wrong direction.

When Campos saw the car on Granite Street, he rode his bicycle into a yard because the car had sped up and he thought the passengers were going to do something to him. He testified that when he looked

at the car again, he saw the defendant in the front passenger seat. He saw the defendant pull out a firearm and start shooting in his direction. Campos jumped off his bicycle and ran when he heard the gunshots. He noticed after the shooting that he had been shot in the thigh. He went to Stone City Pizza, which was about 10 feet away, to get help, and he was taken from there to the hospital.

Campos testified that the car was stopped when he saw it the second time, that he observed the defendant from about 20 to 25 feet for about 10 seconds before the gunshots were fired, and that he heard about 6 or 7 gunshots. He stated that it was sunny at the time of the shooting and that nothing obstructed his view of the defendant.

Campos testified that the police questioned him at the hospital on the day of the shooting. The police gave him a photographic lineup with six photos and asked him to identify his shooter. Campos identified the defendant from the lineup, and he testified that neither the police nor anyone in the hospital had suggested whom he should pick from the lineup. Campos testified that his mother came into his hospital room after the identification. She said that she heard someone named Honeycomb, which was the defendant's nickname, committed the shooting. Campos stated that his mother was not screaming and that she did not say that he had gang affiliations. However, Campos acknowledged that his three brothers were members of the Vice Lords. Campos also denied telling the police that he was helping his uncle in the rear of Stone City Pizza at the time of the shooting.

Campos testified that the defendant was his brother's half-brother and that he had seen the defendant about 10 to 15 times prior to the shooting. Campos stated that despite seeing the defendant on many occasions, he had no relationship with him.

Detective Shawn Flipiak of the Joliet police department testified that he went to the hospital on July 23, 2005, to speak with Campos after the shooting. He had only basic information about the shooting and did not have a suspect when he arrived at the hospital. Flipiak and his partner entered Campos's room and began to speak with him when Campos's mother, Joanne Gutierrez, entered the room screaming. Gutierrez had entered just as Flipiak had asked Campos whether he had any gang affiliations, and she screamed that Campos had friends who were Vice Lords and that Campos should tell the police the truth. Gutierrez then said that someone told her that Honeycomb committed the shooting. Flipiak and his partner escorted her out of the room and spoke to her and Valerie Contreras, the person who told Gutierrez about Honeycomb.

After speaking with Gutierrez and Contreras, Flipiak went back into the room and asked Campos if he knew who shot him. Campos

told him that he could identify the shooter, but he did not give Flipiak the name of the shooter. Flipiak had another officer create a photographic lineup and showed the lineup to Campos. Campos identified the defendant as the shooter. Flipiak testified that no one suggested whom Campos should pick from the lineup.

Flipiak further testified that Campos told him that he was in the rear of Stone City Pizza, assisting his uncle, before the shooting. Campos did not tell Flipiak that he was coming from a convenience store or that he was on a bicycle. Campos also did not tell Flipiak that he had met the defendant 10 or 15 times.

Gutierrez testified that on July 23, 2005, she went to the hospital after she learned that Campos had been shot. When she arrived, her husband was in a room with Campos. She asked Campos what happened, and he told her that Honeycomb shot him. Gutierrez also learned that Honeycomb may have committed the shooting from Contreras. Gutierrez testified that she told the police that Campos and Contreras told her that Honeycomb committed the shooting.

Gutierrez stated that her family still had a relationship with the defendant's family because one of her sons was in a relationship with the defendant's sister.

In his case-in-chief, the defendant recalled Flipiak. Flipiak testified that Gutierrez did not tell him that Campos had told her that Honeycomb was the shooter.

The defendant also presented the testimony of Jessica and Gina Hernandez. Jessica Hernandez, the defendant's aunt, testified that on July 23, 2005, she was having a garage sale at her house with her children, the defendant, his mother, and Gina. She testified that the defendant came to her house at about 9 a.m. and that he left twice during the day. He first left with Gina to get lunch, and then he left a second time to help someone who had car trouble. Jessica testified that the defendant finally left her house as it was getting dark. She testified that the defendant was at her garage sale the next day. A copy of the permit for the garage sale was entered into evidence. It showed that it was valid from July 22 to July 24, 2005. Jessica testified that she first told an investigator that the defendant was at her garage sale on July 23, 2005, in January 2006.

Gina, the defendant's former girlfriend and the mother of his child, testified that on July 23, 2005, she and the defendant went to Jessica's house for a garage sale. She testified that they arrived in the early morning and that they left for lunch at about noon. She stated that while they were away at lunch, they stopped to help the defendant's sister with her car. They returned to the garage sale after about 45 minutes and stayed until dark. Gina testified that the

defendant was arrested the next morning. Gina first told an investigator that the defendant was with her at a garage sale on July 23, 2005, in February 2006.

In rebuttal, Detective Carlos Matlock testified that he spoke with the defendant on July 24, 2005, at the Joliet police department. Matlock informed the defendant that he was a suspect in a shooting involving Campos. Matlock testified that the defendant did not tell him that he was at a garage sale on July 23, 2005. The defendant told him about some other person being involved in the shooting.

Michelle Palaro, an investigator for the defense, testified that she interviewed Jessica. Palaro testified that Jessica did not know the exact date that the defendant was at her garage sale because it happened over a couple of days. Jessica also told her that the defendant stayed for the entire garage sale and left in the evening between 5 and 7 p.m.

During closing argument, the State explained that the most important issue in the case was the identity of the shooter, and it argued that Campos's identification of the defendant was reliable under the circumstances.

In his closing argument, the defendant asked the jury to consider whether Campos was the only witness to the shooting because it happened in broad daylight in a residential neighborhood in July. The defendant also argued that Gutierrez influenced Campos's identification of the defendant because she came in his hospital room and said that Honeycomb committed the shooting. In making this argument, the defendant pointed out that the State tried to lessen the impact of Gutierrez's influence by asking Campos and Flipiak whether anyone suggested who Campos should identify in the lineup.

In rebuttal, the State argued:

"And counsel pointed out that the lineup we used, when we used this lineup, I asked Detective Flipiak about whether or not anybody suggested an answer. Of course I'm going to ask him. If someone suggested to him that he pick [the defendant], well, then, it's not a good identification. You would never want anyone to suggest an answer to anyone when they are observing a lineup. So I think that was important and I wanted to be clear. Because family members are running in and out, I wanted to be clear with Detective Flipiak. Did anybody tell who to pick out? Did anybody suggest to him who it was? And he said no.

He also—he, being Jose Campos—also told you that when he was shot, he was the only one present. Well, that explains—doesn't that explain why there were no other eyewitnesses? He is the only one there. He went into Stone City Pizza to get help. If someone else

was standing there and saw it, wouldn't you think they'd go and get help for him?

\* \* \*

\*\*\* Ladies and gentlemen, I certainly wouldn't come here before you and hold back eyewitnesses who could identify this defendant when I had three or four other people in the neighborhood that could do it.

It's clear, based on Jose Campos's testimony, that he was the only one there, and he was the only one that saw the defendant because he was the only one there."

The State also addressed the defendant's alibi that he had been at a garage sale at the time of the shooting. The State argued:

"[I]f the defendant was at a garage sale all day on July 23, then on July 24, when he has this conversation about this case with Carlos Matlock, why wouldn't he have said, hey, I was with my family all day July 23. My whole family. Not just Jessica and Gina. My whole family. I was there with them. You can ask them. I was there with them the whole day.

He didn't even bring up the word garage sale to Carlos Matlock. He didn't ever admit or deny the offense. He talked about something else that didn't have anything to do with this offense. But certainly that may have been a nice time to say, hey, I have an alibi. I was at this garage sale with my family. I didn't do it."

The jury found the defendant guilty of aggravated battery with a firearm. On August 8, 2007, the defendant filed a motion for a new trial, and August 16, 2007, the trial court denied the motion.

On August 16, 2007, the trial court held a sentencing hearing for cases Nos. 05—CF—1512 and 06—CF—829. The trial court sentenced the defendant to 19 years in prison for aggravated battery with a firearm in case No. 05—CF—1512. That sentence was to run consecutive to the concurrent sentences of 11 and 3 years in prison for aggravated discharge of a firearm and unlawful possession of a firearm, respectively, in case No. 06—CF—829. The defendant was also ordered to pay $4,212 in public defender fees for both cases and separate $15,000 fines for both aggravated battery with a firearm and aggravated discharge of a firearm.

The defendant appeals.

## ANALYSIS

### A. Speedy Trial

On appeal, the defendant first argues that his trial counsel was ineffective because his counsel failed to protect and preserve his statutory right to a speedy trial in case No. 05—CF—1512. Specifically, the

defendant argues that counsel did not protect his right to a speedy trial because he failed to file an effective written demand for a speedy trial or withdraw his bond in case No. 05—CF—1512. He argues that he was prejudiced by counsel's failure to file an effective written demand for a speedy trial or withdraw his bond because he was not brought to trial on the charge of aggravated battery with a firearm within 160 days of his acquittal on the other charges in case No. 05—CF—1512.

To prevail on a claim for ineffective assistance of counsel, a defendant must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) counsel's representation prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

We shall not address the question of whether counsel properly demanded a speedy trial, because we find that the defendant was not prejudiced by any error. The only way in which the defendant may have been prejudiced by counsel's representation was if there was a basis for arguing a speedy trial violation. *People v. Cordell*, 223 Ill. 2d 380, 390, 860 N.E.2d 323, 330 (2006). Accordingly, we shall analyze whether the defendant's speedy trial rights were violated before he was tried for aggravated battery with a firearm in case No. 05—CF—1512.

Section 103—5(e) of the Code of Criminal Procedure of 1963 (Code) provides, in relevant part:

"If a person is simultaneously in custody upon more than one charge pending against him in the same county, or simultaneously demands trial upon more than one charge pending against him in the same county, he shall be tried *** upon at least one such charge before the expiration relative to any such pending charges of the period prescribed by subsections (a) and (b) of this Section. Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered ***; if either such period of 160 days expires without the commencement of trial of, or adjudication of guilt after waiver of trial of, any of such remaining charges thus pending, such charge or charges shall be dismissed and barred for want of prosecution unless delay is occasioned by the defendant[.]" 725 ILCS 5/103—5(e) (West 2004).

The defendant argues that he was not tried for aggravated battery with a firearm in case No. 05—CF—1512 within 160 days of his acquittal on four unrelated firearm offenses under the same case number because of a delay caused by the State. The State argues the opposite conclusion.

From the date of the defendant's acquittal on October 5, 2006, until the start of his trial on July 9, 2007, 277 days passed for speedy trial purposes. *People v. LaFaire*, 374 Ill. App. 3d 461, 463, 870 N.E.2d 862, 864 (2007) ("The speedy trial term is computed by excluding the first day and including the last, unless the last day is a Sunday or a holiday, in which case it is also excluded"). The parties agree that the State was responsible for 61[1] days of delay and that the defendant was responsible for 110[2] days of delay. They dispute who is responsible for the remaining 106 days. The disputed 106 days are split into five time periods: October 5, 2006, to October 13, 2006 (8 days); December 4, 2006, to December 5, 2006; (1 day); January 10, 2007, to January 12, 2007 (2 days); January 12, 2007, to March 13, 2007 (60 days); and March 14, 2007, to April 18, 2007 (35 days). If the defendant was responsible for eight days of that delay, then his speedy trial rights would not have been violated, *i.e.*, he would have been tried with 160 days of the previous trial.

"A delay is 'occasioned by the defendant' when the defendant's acts caused or contributed to a delay resulting in the postponement of trial." *People v. Hall*, 194 Ill. 2d 305, 326-27, 743 N.E.2d 521, 534 (2000), quoting *People v. Kliner*, 185 Ill. 2d 81, 114, 705 N.E.2d 850, 868 (1998). An express agreement to a continuance is an affirmative act attributable to the defendant. *People v. Reimolds*, 92 Ill. 2d 101, 440 N.E.2d 872 (1982). However, "mere silence on the part of the defendant or failure to object to the State's request for a delay does not amount to an agreement or waiver of the right to a speedy trial by the defendant." *Reimolds*, 92 Ill. 2d at 106, 440 N.E.2d at 875. Any delay attributed to the defendant tolls the applicable statutory period. 725 ILCS 5/103—5(f) (West 2004).

The delay between October 5, 2006, and October 13, 2006 (eight days) was attributable to the defendant, not the State. After his acquittal on four firearm offenses in case No. 05—CF—1512 on October 5, 2006, the defendant stated that the remaining charge in case No. 05—CF—1512 and case No. 06—CF—829 were not set for trial and requested a status date. The State agreed to the status date, and the trial court set a status hearing for October 13, 2006. The defendant's affirmative act of requesting a status date and agreement to it caused

---

[1]The 61 days of delay: October 13, 2006, to December 4, 2006 (52 days); March 13, 2007, to March 14, 2007 (1 day); and June 20, 2007, to June 28, 2007 (8 days).

[2]The 110 days of delay: December 5, 2006, to January 10, 2007 (36 days); April 18, 2007, to June 20, 2007 (63 days); and June 28, 2007, to July 9, 2007 (11 days).

the delay between October 5, 2006, and October 13, 2006. See *People v. Woodrum*, 223 Ill. 2d 286, 299, 860 N.E.2d 259, 269 (2006) ("An agreed continuance generally constitutes an act of delay attributable to the defendant"); *Kliner*, 185 Ill. 2d 81, 705 N.E.2d 850 (same); see also *LaFaire*, 374 Ill. App. 3d at 467, 870 N.E.2d at 867 (Carter, J., dissenting) (stating that a speedy trial term is tolled and the delay is attributable to the defendant when a date is set by agreement of the parties, whether the "date set is a status date or a trial date, or within or outside of the original speedy trial term").

■ As mentioned above, to conclude that the defendant's speedy trial rights had been violated and that he had been prejudiced by his counsel's representation, we had to find that he was not responsible for more than seven of the disputed days of delay. Because we find that the eight days of delay between October 5, 2006, and October 13, 2006, were attributable to the defendant, we cannot conclude that the defendant's speedy trial rights were violated. The defendant was not prejudiced by his counsel's representation as he was properly tried for aggravated battery with a firearm in case No. 05—CF—1512 within 160 days of his acquittal on four unrelated firearm offenses under the same case number.

### B. Testimony and Argument About the Defendant's Silence

●3 The defendant next argues that he was denied a fair trial for aggravated battery with a firearm in case No. 05—CF—1512 because the State elicited testimony from Detective Matlock that the defendant did not mention an alibi, thereby improperly introducing evidence of the defendant's postarrest silence, and the State repeated the improper evidence during rebuttal closing argument.

Initially, we note that the defendant failed to preserve this issue for appeal because he did not object to Matlock's testimony or the State's rebuttal closing argument, and he did not raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988) (noting that a failure to both object at trial and raise an issue in a posttrial motion waives the issue on appeal). Nonetheless, the defendant argues that we should review the issue under the plain error doctrine. Under the plain error doctrine, a reviewing court may consider a forfeited error when either "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005). Here, the evidence of the defendant's guilt was closely balanced because it primarily depended on the reliability of Campos's identification of the defendant. As such, we must determine whether the State committed an error when it

elicited testimony from Matlock that the defendant did not mention an alibi and repeated the testimony during rebuttal closing argument.

The defendant argues that the State erred in eliciting evidence about the defendant's postarrest silence. The record is silent as to whether the defendant received *Miranda* warnings. The defendant argues that if he had been given *Miranda* warnings, the State committed error under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), and if he had not been given such warnings, the State committed error under *People v. Clark*, 335 Ill. App. 3d 758, 781 N.E.2d 1126 (2002). The State acknowledges that the record is silent as to whether the defendant received *Miranda* warnings but assumes that they were given. It argues, without citation to authority, that defendant's failure to give the police the names of his alibi witnesses is a proper subject for impeachment when the defendant gives a statement to the police after being given *Miranda* warnings.

In *Doyle*, the United States Supreme Court held that it was a violation of a defendant's due process rights to use a defendant's post-arrest, post-*Miranda* silence for impeachment purposes. *Doyle*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. The Court reasoned that *Miranda* warnings have an implicit assurance that silence will carry no penalty and that it would be fundamentally unfair to allow a defendant's silence to be used to impeach an explanation subsequently offered at trial. *Doyle*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. In *Fletcher v. Weir*, 455 U.S. 603, 71 L. Ed. 2d 490, 102 S. Ct. 1309 (1982), the Court limited its holding to situations in which the defendant's silence occurred after *Miranda* warnings had been given. The Court left it to the states to determine the admissibility of postarrest, pre-*Miranda* silence.

"[U]nder Illinois evidentiary law, it is impermissible to impeach a defendant with his or her post-arrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings." *Clark*, 335 Ill. App. 3d at 763, 781 N.E.2d at 1130. Evidence of the defendant's postarrest silence is considered neither material nor relevant to proving or disproving the charged offense. *Clark*, 335 Ill. App. 3d 758, 781 N.E.2d 1126.

In the present case, the testimony elicited by the State regarding the defendant's postarrest silence, whether before or after *Miranda* warnings were given, was inadmissible. Such testimony was irrelevant under the law of this state, and, if the defendant had been given his *Miranda* warnings, it was a constitutional error. The defendant did not testify at trial, and the State had no basis to impeach him. But see *People v. Little*, 223 Ill. App. 3d 264, 274, 585 N.E.2d 148, 155 (1991) (stating that "if a defendant's exculpatory testimony at trial is

manifestly inconsistent with statements he made after his arrest, comment or evidence about his failure to give the same statement at that time will not violate the *Doyle* rule"); *People v. Chriswell*, 133 Ill. App. 3d 458, 466, 478 N.E.2d 1176, 1182 (1985) (concluding that "a defendant may not be cross-examined regarding his post-arrest silence unless the defendant's trial testimony is inconsistent with the pretrial statements that were made to police"). The defendant's alibi was offered by Jessica and Gina Hernandez, and the State, as it did at trial, could properly impeach them regarding their prior silence. See *People v. Berry*, 264 Ill. App. 3d 773, 779, 642 N.E.2d 1307, 1313 (1994) (stating that an alibi "witness can be impeached with prior silence where it is shown that the witness had the opportunity to make an exculpatory statement and, under the circumstances, a person would normally have made that statement"). However, the State could not use the defendant's postarrest silence to impeach the alibi witnesses. The State erred when it elicited Matlock's testimony about the defendant's postarrest silence and repeated this improper evidence during rebuttal closing argument. We conclude that this error, combined with the closely balanced nature of the evidence, amounted to plain error and that it warrants a reversal and a remand for a new trial for aggravated battery with a firearm.

### C. Rebuttal Closing Argument

We need not consider whether the State committed prosecutorial misconduct during rebuttal closing argument because we are remanding the case for a new trial on the charge of aggravated battery with a firearm. The issue is unlikely to recur on retrial under the same circumstances.

### D. Public Defender Reimbursement Fees and Monetary Credit for Time Served in Pretrial Custody

■ Finally, the defendant argues that: (1) the trial court erred in ordering him to pay a $4,212 public defender reimbursement fee without notice and a hearing; and (2) he is entitled to a credit of $5 per day for time served in presentence custody. The State concedes error on both issues.

Section 113—3.1(a) of the Code requires a trial court to conduct a hearing concerning a defendant's ability to pay before it may order the defendant to pay a public defender reimbursement fee. 725 ILCS 5/113—3.1(a) (West 2006). Prior to the hearing, the trial court must give the defendant notice that it is considering ordering payment under section 113—3.1(a) of the Code so that the defendant has the opportunity to present evidence of his or her ability to pay. *People v. Bass*, 351 Ill. App. 3d 1064, 815 N.E.2d 462 (2004). At the hearing, the

trial court must consider the defendant's affidavit of assets and liabilities and any other evidence of the defendant's financial circumstances. 725 ILCS 5/113—3.1(a) (West 2006).

Here, the record shows that the trial court did not give the defendant notice or the required hearing under section 113—3.1(a) of the Code when it imposed a $4,212 public defender reimbursement fee in cases Nos. 05—CF—1512 and 06—CF—829. Thus, we vacate the $4,212 public defender reimbursement fee and advise the trial court to conduct a proper hearing under section 113—3.1(a) if it intends to order a public defender reimbursement fee following the defendant's new trial for aggravated battery with a firearm in case No. 05—CF—1512.

■ The defendant also argues that he is entitled to a monetary credit for time served in presentence custody in cases Nos. 05—CF—1512 and 06—CF—829 to be applied against his $15,000 fines in each of those cases. Because we have reversed the defendant's conviction for aggravated battery with a firearm and the resulting $15,000 fine in case No. 05—CF—1512, we need not address this issue as to that case. The defendant, though, is entitled to monetary credit in case No. 06—CF—829. The record shows that he served 493 days in presentence custody, and he did not receive a $5 credit for each day served in presentence custody. 725 ILCS 5/110—14 (West 2006). Therefore, we find that the defendant is entitled to a credit of $2,465 against his $15,000 fine in case No. 06—CF—829.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed in part and reversed in part.

Affirmed in part and reversed in part; cause remanded.

O'BRIEN, P.J., and WRIGHT, J., concur.